UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Neileigh Regets, individually and as
Personal Representative of the Estate
of Thomas J. Steiner, Deceased,

      Plaintiff,

v.                          Case No. 11-11746

City of Plymouth, *et al.*,         Honorable Sean F. Cox

      Defendants.
_____/

## OPINION & ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff brought this § 1983 action on behalf of herself and the estate of her deceased husband, asserting claims against the City of Plymouth and three of its police officers. Plaintiff also asserts state-law claims for intentional infliction of emotional distress. The matter is currently before the Court on Defendants' Motion for Summary Judgment, brought after the close of discovery. The parties have fully briefed the issues and the Court heard oral argument on April 4, 2013. For the reasons set forth below, the Court shall GRANT the motion.

### BACKGROUND

Plaintiff Neileigh Regets, individually and as Personal Representative of the Estate of Thomas J. Steiner, deceased ("Plaintiff" or "Neileigh"), filed this action on April 21, 2011, asserting claims against the City of Plymouth and three of its police officers: 1) Chief Wayne

1

Carroll; 2) Detective Lieutenant Al Cox; and 3) Sergeant Jamie Grabowski.[1]

**Claims In This Action**

Plaintiff's Complaint asserts the following claims:  "False Arrest and False Imprisonment

 Ms. Regets" (Count I); "Violation of the Fourth Amendment: Unreasonable Search and Seizure

42 U.S.C. § 1988 [sic]    Ms. Regets" (Count II); "Civil Conspiracy to Violate Plaintiff's Civil

Rights 42 U.S.C. § 1983    Ms. Regets" (Count III); "Municipal Liability Under 42 U.S.C. § 1983

 Ms. Regets" (Count IV); "Intentional Infliction of Emotional Distress    Ms. Regets" (Count

V); "Deliberate Indifference to a Known Medical Condition 42 U.S.C. § 1983 Fourteenth

And/Or Eighth    Estate" (Count VI); "Unreasonable Search and Seizure, Fatal Force 42 U.S.C. §

1983    Under Fourth Amendment    Estate" (Count VII); "Municipal Liability Under 42 U.S.C. §

1983    Estate" (Count VIII); "Americans with Disabilities Act Claim    42 U.S.C. 12132

Estate" (Count IX); "False Imprisonment    Estate" (Count X); and "Intentional Infliction of

Emotional Distress    Estate" (Count XI).

Plaintiff's relationship with her original attorney who filed this action broke down and he

ultimately withdrew.  Plaintiff then retained new counsel.

The Fourth Scheduling Order in this case provided that discovery closed on October 16,

2012.

Following the close of discovery, Defendants filed the instant Motion for Summary

Judgment.  (Docket Entry No. 41).

---

[1]The Court notes that the Defendants' titles have changed following the events at issue in
this case.  Chief Carroll is now retired, Al Cox is the current Chief of Police, and Sergeant Jamie
Grabowski is now a Lieutenant.  For simplicity sake, the Court will refer to each of these
Defendants by the term "officer" at any times wherein the Defendant's title is not relevant.

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3). Defendants complied with the Court's practice guidelines for motions for summary judgment such that their motion includes a "Statement of Material Facts Not In Dispute" (Docket Entry No. 41 at Pg ID 516-18, "Defs.' "Stmt."). Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" (Docket Entry No. 52 at Pg ID 681-84, "Pl.' s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Plaintiff, the nonmoving party.

**Factual Background**

Neileigh met decedent Thomas Steiner ("Thomas") in 2002. (Pl.'s Dep. at 30). Neileigh and Thomas married in 2006. (Defs.' Stmt. at ¶ 2; Pl.'s Stmt. at ¶ 2). Thomas was 62 years old, and in poor health, at the time of the marriage and Neileigh was 26 years old. (Pl.'s Dep. at 11).

3

Neileigh has two children from prior relationships.  Neileigh has a daughter with a man named Brian Ross, who was not involved in this case.  (Pl.'s Dep. at 9-10).  A man named Christopher Kish ("Kish") is the father of Neileigh's son.  (Defs.' Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1). Neileigh testified that Kish tried to strangle her in 2004 and that she reported the incident to the Livonia Police Department.  (Pl.'s Dep. at 23).  According to Neileigh, Kish has not been very involved in his child's life, but shows up approximately every two years.  (*Id.* at 55).

In April of 2006, Neileigh and her two children began living at a house located at 305 Arthur Street in Plymouth, Michigan.  (Pl.'s Dep. at 9-11).  Although they were married at that time, Thomas lived at a home he owned in Rochester, Michigan.  (*Id.*).

Shortly after Neileigh and Thomas wed, Thomas was hospitalized with both heart and respiratory failure, which resulted in Thomas being placed on life support for a period of 53 days. (Pl.'s Br. at 1; Pl.'s Dep. at 37-41).  After being released from the hospital, Thomas was placed in a nursing home, where he remained until the spring of 2008.  (*Id.*).

Upon leaving the nursing home, Thomas initially moved into the house on Arthur Street. (*Id.*).  After one to two months of living in the house, however, Thomas began having emotional outbursts and suffering short-term memory problems.  (Pl.'s Dep. at 41-42).  Thomas then moved out of the house on Arthur Street and began staying at a Red Roof Inn in Plymouth, Michigan. (*Id.*).  Neileigh later relocated Thomas to an Extended Stay America hotel in Canton, Michigan. (*Id.*).

During the first six months of 2009, Neileigh would visit Thomas at his hotel room almost every day.  (Pl.'s Dep. at 44).  During that time period, Thomas would come to the house on Arthur Street a few times a month and he would go out to dinner with Neileigh and her

4

children once a week.  (*Id*. at 44-45 & 52).

At the time of the incidents at issue in this case, which took place in June of 2009, Thomas had multiple health issues for which he took various medications.  (Defs.' Stmt. at ¶ 5; Pl.'s Stmt. at ¶ 5).  Neileigh testified that Thomas suffered from heart problems, bipolar disorder, and Alzheimer's disease.  (Pl.'s Dep. at 36-37).  Thomas took medications for his heart problems, his blood pressure, and his Alzheimer's disease.  He was also taking an anti-depressant.  (*Id*.).

Neileigh testified that, during the first six months of 2009, Thomas did not talk about suicide "per se," but talked about how it was hard to keep going on.  (Pl.'s Dep. at 49).  Neileigh understood such comments to mean that Thomas was talking about committing suicide.  (*Id*.).

Thomas's medications were delivered to the house on Arthur Street via a mail-order prescription service and Neileigh would bring them to Thomas at the hotel.  (Pl.'s Dep. at 46 & 67).  Shortly after the beginning of 2009, Neileigh stopped preparing his pills for him and would let Thomas take his own medication.  (Pl.'s Dep. at 51).  Neileigh testified as follows:

> Q. Did it ever occur to you that he might, given that he was talking about what you perceived to be committing, giving him large amounts of pills like that might not be a good idea?
> A. I hesitated, yes.
> Q. Did you do anything about that hesitation?
> A. Yes, I did.
> Q. What did you do?
> A. Would check his medications almost on a daily to make sure that he was taking the certain ones every day, no more, no less, and everything was where it was supposed to be and everything matched up from when he should start taking the prescription to what would be left in the bottle.
> Q. You said you would do this on almost a daily basis?
> A. Yes.

(Pl.'s Dep. at 52).

Neileigh testified that, from time to time, Thomas's doctors would change his medications. When Thomas was told to stop taking a given medication, Neileigh would still keep the remaining pills at her house, in case he was placed back on that medication later. (Pl.'s Dep. at 68).

The events at issue in this case occurred in June of 2009. In June of 2009, Neileigh was still living at 305 Arthur Street in Plymouth, Michigan. (Defs.' Stmt. at ¶ 3; Pl.'s Stmt. at ¶ 3). Her son lived there with her and so did her daughter. (Defs.' Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1). Thomas Steiner was not living there; he was still living at the Extended Stay America hotel in Canton, Michigan. (Defs.' Stmt. at ¶ 4; Pl.'s Stmt. at ¶ 4).

Kish was in Michigan in June of 2009. (Defs.' Stmt. at ¶ 7; Pl.'s Stmt. at ¶ 7). Kish came to the house on Arthur Street to see his son. (Pl.'s Dep. at 57). Kish told Neileigh that he wanted to be a father to his son. (Pl.'s Dep. at 111). Neileigh was somewhat optimistic about Kish establishing a relationship with his son. During June of 2009, Kish would come to the house on Arthur Street to play with his son and also took him to the zoo. (*Id.*). Within the week of the events at issue, Kish babysat Neileigh's two children while Neileigh and Thomas went out to dinner. (Defs.' Stmt. at ¶ 8; Pl.'s Stmt. at ¶ 8).

Neileigh testified that at some point in June of 2009, however, her optimism about Kish changed. Kish asked Neileigh for money and she refused to give him any. (Pl.'s Dep. at 58 & 111). Kish was upset that Neileigh would not give him money and told Neileigh that she would "be screwed." (*Id.* at 58). Neileigh testified that, although she understood that to mean that her life was in danger, she did not report the incident to any authorities. (*Id.* at 58-59).

6

Prior to June 19, 2009, Neileigh had never reported any problems with Kish to the Plymouth Police Department. (Pl.'s Dep. at 61).

On June 18, 2009, Kish went to the Plymouth Police Department and gave a statement. (Defs.' Stmt. at ¶ 9; Pl.'s Stmt. at ¶ 9). Kish initially spoke with Officer Matt Stoops. (Cox Dep. at 21). Officer Stoops asked then-Lieutenant Al Cox to join the conversation with Kish. Prior to this conversation, Officer Cox had never heard of Kish. (Cox Dep. at 20).

After hearing Kish mention Neileigh Regets, Cox recognized her name because there had been a series of issues on Arthur Street between Neileigh and her neighbors. (Cox Dep. at 15). Those incidents involved verbal disputes between Neileigh and her neighbors. (*Id*. at 15-17). Officer Cox had also been aware of a prior domestic dispute at the Arthur Street house and it was his impression that Thomas Steiner did not live there with his wife. (*Id*. at 17).

Kish told the officers that he had a son with Neileigh and that he had just recently returned to Michigan. (Cox Dep. at 23 & 26). Kish told the officers that, on several occasions while visiting his son since returning to Michigan, Neileigh had stated that she was going to help Thomas Steiner commit suicide. The officers then asked Kish to write out a written statement, which he did. Kish's written statement, which he signed under penalty of perjury, states:

> This statement is about Neileigh Regets and the attempt to help Tom Steiner commit suicide. I arrived in town on June 12th. Upon visiting my son, Neileigh has had many talks about helping Tom commit suicide. Neileigh told me that she is going to help Tom commit suicide before his life insurance policy ends. She also stated that she is going to give him pills that have been delivered to her house on Arthur Street. When the pills arrived at her house, she looked up at me and said "these are the pills" then her daughter Kaylee said "those are the pills" like she knew what was happening. Tom and Neileigh also discussed waiting to commit suicide after Father's Day. They also discussed when Neileigh was to call if he didn't answer the phone then that was the sign to come to the hotel and find

7

him.  Tom also stated that he wanted to give one of his sons a Rolex.  She told me
she wanted to keep it for money it was worth 19,000 and she already found
someone to buy the watch for $9,000.

Note    the Bag with the pills is a small grayish white bag.  Was last seen in office
on Floor on left side of Desk.

(Ex. C to Defs.' Br.).  Kish also provided the officers with a handwritten diagram of the house on

Arthur Street and the location of the pills.

Officer Cox discussed the situation with then-Chief Wayne Carroll.  Chief Carroll also

recognized Neileigh's name because he was also aware that officers had previously responded to

several minor disputes between neighbors on Arthur Street and that Neileigh had been involved

in some of them.  (Carroll Dep. at 33-34 & 38-39).  He described those incidents as "two or three

groups of people interact[ing] in a very immature manner."  (*Id*. at 74).  Chief Carroll did not

know Thomas Steiner, but knew that Neileigh had married "an elderly gentlemen", that there had

been some kind of domestic dispute, and that he "was no longer living in his home, or the home

he had before the marriage. He was living somewhere else."  (*Id*. at 39-40).

Chief Carroll instructed Officer Cox to contact the Wayne County Prosecutor's Office.

(Carroll Dep. at 40).  Because they had a child together, Chief Carroll was aware that Kish had a

prior relationship with Neileigh and that was one of the reasons that he had Officer Cox get the

Wayne County Prosecutor involved. (*Id.* at 45).

After Kish left the station, Officer Cox called the Wayne County Prosecutor's Office and

spoke to Assistant Prosecutor Barb Smith, who referred him to Bob Stevens ("Stevens") of the

homicide unit.  (Cox. Dep. at 42).  Officer Cox told Stevens what Kish had told the officers.

Stevens responded that he wanted to speak with Kish himself.  (Cox Dep. at 42-43).  The

8

following day, Officer Cox picked up Kish and took him to the Wayne County Prosecutor's

Office.  Officer Cox testified:

> Q.  How would you characterize the conversation that Mr. Stevens had with Mr. Kish in front of you?
>
> A.  Mr. Stevens went through several minutes of reading him the pains of perjury, he was put under oath and he then answered Mr. Stevens questions regarding Mr. Kish's written statement and what he had told us and we were down there I don't know how long, we were down there for a little while while he asked him, you know, tell me what you told them.
>
> . . . .
>
> Q.  All right.  When Mr. Stevens put Mr. Kish under oath how did he do that?
>
> A.  He had him raise his right hand and he gave him the same oath that I took when I came in here and then he proceeded to listen to Mr. Kish speak and then asked him questions.
>
> Q.  Was there any, was there a court reporter present?
>
> A.  Yes, there was.
>
> Q.  Have you seen that transcript?
>
> A.  No, I have not.
>
> . . . .
>
> Q.  What was the outcome of that witness statement slash meeting?
>
> A.  After he talked to him he told us he said you need to take her into custody and we need to get a search warrant for the house and where Mr. Steiner is staying because Mr. Stevens was aware that Mr. Steiner was staying at a location other than the house and so we began to, we took Mr. Kish back to where he was staying then we got to work on search warrants.
>
> . . . .
>
> Q.  As you understand the law if Mr. Stevens tells you you should take her into custody does that mean you had to do it?
>
> A.  No, we basically consulted with him and he felt that there was enough probable cause to take her into custody.
>
> Q.  Did he tell you that?
>
> A  Yes.
>
> Q.  But the fact that he found or he though there was probable cause that doesn't necessarily mean that you had to think there was probable cause?
>
> A.  Correct.
>
> Q.  And then the same thing with regard to a search warrant.  Simply because Mr. Steven may say that's what he would do or he suggest doesn't mean you have to do it?

> A.    Correct.
> Q.    You have the discretion to do that or not do that?
> A.    Correct.
> Q.    You folks went back and in fact did get a search warrant, right, sir?
> A.    Yes.

(Cox. Dep. at 45-48).

During his deposition in this action, Stevens confirmed that Officer Cox came to him with certain information regarding Neileigh and, thereafter, he questioned a witness under oath pursuant to an investigative subpoena. (Steven Dep. at 9-12). Because he is precluded by statute from divulging certain information obtained during that process, however, he could not answer certain questions during his deposition. (*Id*. at 13-14). Stevens did confirm, however, that he examined a witness under oath and ultimately concluded that there was sufficient probable cause to obtain search warrants. (*Id*. at 64-65). Stevens testified that he did not direct the officers to take Neileigh into custody because that is a determination that is up to the police officers. (Stevens Dep. at 30-31). Stevens ultimately reviewed the search warrant affidavits in this case and approved them over the phone. (Stevens Dep. at 64-65).

Officer Cox then sought, and obtained, search warrants for the Arthur Street house and Thomas's room at the Extended Stay America hotel. (Exs. K & L to Pl.'s Br.). The search warrant affidavit for the search warrant for the Arthur Street house, signed by Officer Cox, stated:

> 3: The FACTS establishing probable cause or the grounds for search are:
>
> On 6/18/09, Christopher James Kish came to PLPD and reported to Officer Matt Stoops that he had received information that Neileigh Regets, who resides at 305 Arthur Street in the City of Plymouth, County of Wayne, MI, is planning to assist her husband, Thomas James Steiner, in committing suicide very soon.

10

Mr. Kish stated that he is the father of the son of Ms. Regets, and that he has moved back to Michigan to spend more time with his son who also resides at 305 Arthur Street. Mr. Kish stated that while visiting at 305 Arthur Street, Ms. Regets advised him that she intends to assist Thomas Steiner in committing suicide.  Mr. Kish advised that Ms. Regets told him that she had convinced Mr. Steiner to kill himself before his life insurance policy expires.  Mr. Kish advised that he does not know the exact date of expiration, but from what Ms. Regets has told him, he is under the impression that it expires in about one week.  Mr. Kish advised that Ms. Regets told him that she planned to give Mr. Steiner pills that he would ingest and ultimately end his life.  The pills were to be delivered to the home at 305 Arthur Street.  Mr. Kish stated that on 6/16/2009, while at the Arthur Street home, a package arrived and Ms. Regets looked at him and stated, " . . . these are the pills."

Mr. Kish stated that Neileigh Regets told him that she and Mr. Steiner had discussed that Mr. Steiner should wait to commit suicide until after Father's Day on 6/21/2009.  Ms. Regets also told Mr. Kish that the plan was that she would give Mr. Steiner the pills, and that she would later call him at his hotel room.  If Mr. Steiner did not answer the phone, that was the sign for Ms. Regets to go to the hotel and find him deceased.  Mr. Kish explained that even though Ms. Regets and Mr. Steiner are married, Ms. Regets lives at the Arthur Street home with her children, but that Mr. Steiner resides at the Extended Stay America Hotel, located near Ford Road in Canton, MI.  Mr. Kish does not know the exact room number, but stated that Ms. Regets has told him that Mr. Steiner lives at the hotel. Mr. Kish stated that he is also aware of a situation a few days prior to his report in which Ms. Regets intended to take three large bottles of liquor to Mr. Steiner that he intended to consumer all-at-once, resulting in his death.  Mr. Kish stated that Ms. Regets had received a text message, from whom he believed to be Mr. Steiner, making the request that she bring him the liquor.  Mr. Kish stated that he was present as she prepared to leave to purchase the liquor and take it to Mr. Steiner, but that he was able to convince her not to do it.

Mr. Kish also advised that Ms. Regets had inquired if he thought it would bad if she kept a $19,000 Rolex watch that Mr. Steiner intended to leave to one of his sons if anything happened to him.  Ms. Regets stated that she wanted to keep the watch, because she had already found someone willing to buy the watch for $9000.

Mr. Kish described the package, that Ms. Regets referred to as ". . . these are the pills,", as a small grayish white bag that when shaken " . . .sounded like pills."

11

Mr. Kish stated that he does not know the type of pills or where they came from. When asked where the pills were now located, Mr. Kish also drew a map of the home describing the location of the pills (attached). Mr. Kish last left the Arthur Street home on 6/17/09. He advised that he told Ms. Regets that she should not assist Mr. Steiner in committing suicide.

On 6/18/2009, Mr. Kish told Affiant, via telephone, that he is certain that Ms. Regets's children are also aware of the situation, because he stated that he has heard Ms. Regets tell them that they will have a "last dinner" with Mr. Steiner. Mr. Kish also stated that Ms. Regets's 11 year old daughter also made a reference to the above referenced pills as ". . . those are the pills," as if she knew the plan as well.

Based on Affiant's training and experience, subjects contemplating suicide will at times research various methods such as drugs and their interactions with other drugs. Affiant is also aware that the research may include reading about suicide in books, such as the "Final Exit . . ." by Derek Humphrey. The Internet also contains great amounts of information regarding drugs, their interactions, as well as suicide.

Affiant is also aware that Ms. Regets has been engaged in on-going neighbor disputes with several neighbors on her street. At one point, PLPD Officers were advised that Ms. Regets had placed a video recording device in one of her windows which captured outside activity. The audio captured on this device however would be conversations that took place within the home, to perhaps include the very conversations reported by Mr. Kish.

(Search Warrant Affidavit for Arthur Street house, Docket Entry No. 56-1 at Pg ID 970-73). The search warrant affidavit for the Extended Stay America hotel room where Thomas was staying is substantially the same. (Docket Entry No. 56-1 at Pg ID 974-77).

On June 19, 2009, two search warrants were issued which authorized searches of, respectively, 305 Arthur Street and Thomas's room at the Extended Stay America hotel. (Defs.' Stmt. at ¶ 10; Pl.'s Stmt. at ¶ 10). Those search warrants were signed by Judge Plakas.

On June 19, 2009, Chief Carroll, Officer Cox, and Officer Grabowski went to the Arthur

Street residence to execute the search warrant.  Neileigh was outside of the residence when they

arrived.  (Cox Dep. at 62).  Neileigh was told by Officer Cox that she was being arrested for

attempting to assist Thomas Steiner commit suicide in violation of Michigan law.  (Pl.'s Br. at 5;

Cox Dep. at 70-71).  Neileigh denied the allegation.  (*Id.*; Cox Dep. at 70-71).  Neileigh was

placed under arrest, was handcuffed, and taken into custody.  (Cox Dep. at 62).  Officer Cox

believes that Chief Carroll is the officer who actually took Neileigh into custody.  (Cox Dep. at

62).  Neileigh's children were present at the time of her arrest.  (Pl.'s Dep. at 78).

Following Neileigh's arrest, Plymouth police officers conducted a search of 305 Arthur

Street and confiscated certain medications.  (Defs.' Stmt. at ¶ 12; Pl.'s Stmt. at ¶ 12).  The

officers recovered twenty-five prescription bottles from the house, a sandwich bag with

suspected marijuana, and drug paraphernalia.  (Cox Dep. at 66-67).

Several Plymouth police officers then conducted a search of Thomas's room at the

Extended Stay America hotel and confiscated certain medications.  (Defs.' Stmt. at ¶ 13; Pl.'s

Stmt. at ¶ 13).  Officer Grabowski testified that the officers proceeded to the front desk at the

hotel in order to gain access to Thomas's room.  (Grabowski Dep. at 19-20).  When they entered

the room, they found it dark and empty.  Thomas was not there.  (*Id.* at 20).  Upon entering the

hotel room, Officer Grabowski saw a number of prescription bottles lined up on a table and,

based on the way the bottles were lined up, he concluded those bottles contained daily

medications:

> A.     I remember when we were executing the search warrant these were located
> and there was debate on whether we should seize these based on the search
> warrant, it said all medications.  I decided at that point in time that we
> were not going to seize these because they appeared to be daily
> medication.

13

Q.      You're the one that made that determination?

A.      Correct.

Q.      Did you consult with anyone?

A.      I called Chief Cox or Lieutenant Cox at that time to let him know what I
        was planning on doing which was leaving these medications in the room.

Q.      What led you to believe these were daily medications?

A.      They way they were lined up, you know, sitting on a table. It appeared as
        though they were being taken on a regular basis. Just they way that they
        were setup. Another photo if you look at it, if you look at the table itself it
        has multiple things, it has a razor, a nail clippers, matches, cell phone, a
        calculator. It appears to be like a work station type area where somebody
        would be putting their medical things or things they take care of on a daily
        basis.

(Grabowski Dep. at 27-28). Officer Grabowski did not know how long the pills in the bottles

that he left behind would last Thomas. (*Id*. at 32). Officer Grabowski did, however, decide to

confiscate two sealed grayish-white mailing packages from the hotel room, which sounded like

they contained pills. (Grabowski Dep. at 34; Cox Dep. at 63-65). Those sealed packages were

not opened by the officers. (*Id*.).

Although Officer Cox did not participate in the search at the hotel, he contacted Thomas

Steiner via telephone after Officer Grabowski provided him Thomas's telephone number (Cox

Dep. at 62 & 93-94). Thomas told Officer Cox that the officers had taken medications from his

hotel room that were for his bipolar condition, memory loss, his heart, and his cholesterol. (Cox

Dep. at 94 & 97). Thomas advised Officer Cox that the medications were strong and that if he

were to take an overdose of them, he believed he would die. (*Id*.) Thomas told Officer Cox that

he had talked a lot about suicide but denied that Neileigh had ever helped him plan to commit

suicide. Officer Cox asked Thomas how he was feeling at that time and if he had any intention

of harming himself at that time. Thomas replied that he was feeling good and was not going to

14

attempt suicide.  (Cox Dep. at 95).

Officer Cox and Thomas then discussed the packages that the officers had confiscated

from his hotel room.  (Cox Dep. at 97).  Thomas advised that Neileigh had delivered those

packages to him a day or two before the search and that he had not yet opened those packages.

(Cox Dep. at 97-98).  Thomas stated that if he really intended to kill himself he would have taken

the pills the day that Neileigh delivered them to him.  (*Id*.).  Officer Cox told Thomas that the

officers had advised that they believed they left the medications that Thomas uses on a daily

basis in the room.  Officer Cox asked Thomas if he would be alright without the two packages of

medications that had been confiscated by the officers that day.  Thomas told Officer Cox that he

would be ok and that he did not need the medications in the packages at that time. He stated that

he had the medications that he needed and that he would be fine over the weekend and into the

week when he could go to the pharmacy and get another prescription for those medications.

(Cox Dep. at 101-102).  Officer Cox testified that he pressed Thomas on this issue and that

Thomas responded again that he would be fine without the medications that had been confiscated

by the officers.  (*Id*.).

On June 22, 2009, Neileigh was released from jail.  (Defs.' Stmt. at ¶ 14; Pl.'s Stmt. at ¶

14).  Neileigh testified that when she was released from custody she was told not to have any

contact with Thomas.  (Pl.'s Dep. at 94-95).  While she was in custody, Neileigh had received 30

phone calls from Thomas and he had left her 14 messages.  (Pl.'s Dep. at 112).  On June 22,

2009, after being released from custody, Neileigh went to the Extended Stay hotel with her son

and a man named Derek Stegall ("Stegall") because Neileigh wanted to make sure her husband

was okay.  (Pl.'s Dep. at 94).  Stegall went into the hotel and asked a receptionist from the hotel

to check on Thomas in his room.  After checking on Thomas, the receptionist initially came

down and told them that Thomas was sleeping.  (*Id*. at 96).  Neileigh had Stegall ask the

receptionist to check again.  The receptionist then checked again and, when she returned, she said

to call 911.  (*Id*. at 96).

Thomas Steiner was found dead at the Extended Stay hotel in Canton, Michigan on June

22, 2009.  (Defs.' Stmt. at ¶ 15; Pl.'s Stmt. at ¶ 15).

The Wayne County Medical Examiner's Office has concluded that the cause of Thomas's

death was natural disease and that no prescription medications were found in his bloodstream.

(Defs.' Stmt. at ¶ 16; Pl.'s Stmt. at ¶ 16).

An expert witness retained by Neileigh, Dr. Werner Spitz, is prepared to testify at trial

that "Mr. Steiner died as a result of the sudden and unexpected withdrawal of [his] prescribed

medications which negatively impacted his heart.  Hence, had Mr. Steiner been given his

prescribed medication outlined above in their therapeutic levels, Mr. Steiner would not have died

that day from these conditions."  (Dr. Spitz Affidavit, attached as Ex. I to Pl.'s Br.).  Dr. Spitz's

Affidavit further states that "[m]oreover, had Mr. Steiner been appropriately medically and/or

psychiatrically evaluated on Friday, June 19, 2009 he would have been given his prescribed

medications and would not have died on Monday, June 22, 2009."  (*Id*.).

**Plaintiff's First Suit, Case No. 10-12354**

Acting through counsel,[2] Plaintiff first filed suit in federal court    regarding the above

incidents   on June 14, 2010, in Case No. 10-12354.  In that case, Plaintiff named the City of

Plymouth, the three Defendants named in this action, and other named and unidentified "john

---

[2]Plaintiff's current counsel in this case did not represent her in Case No. 10-12354.

16

doe" Defendants.

There were significant delays in serving various Defendants in that action.  In an Order issued on March 14, 2011, this Court denied a motion to extend summons and dismissed Plaintiff's claims against the City of Plymouth, and the claims against Defendants Carroll, Cox, and Grabowski, without prejudice.  (*See* Docket Entry No. 36 in Case No. 10-12354).

On November 22, 2011, the parties stipulated to the dismissal, *with prejudice*, of Plaintiff's claims against: 1) the Township of Plymouth; 2) the Township of Canton; 3) *Detective Lieutenant Al Cox*;[3] and 4) Chief Thomas Tiderington.  (Docket Entry No. 43).

On December 19, 2011, the parties stipulated to the dismissal, with prejudice, of Plaintiff's claims against Robert Kerr.  (Docket Entry No. 44).  That was the last order and closed the case.

**Plaintiff Files This Second Action On April 21, 2011**

Plaintiff filed this action, Case No. 11-11746, on April 21, 2011.  In this action, Plaintiff named the City of Plymouth and the following three officers as Defendants: 1) Chief Carroll; 2) Lieutenant Al Cox; 3) Sergeant Jamie Grabowski.

Kish has not been deposed in this action because his whereabouts are currently unknown. Plaintiff deposed Kish's father during discovery, who testified that he does not know where his son is currently.  (Ex. E to Pl.'s Br.).  Kish's father also testified that he "probably could take a guess at" what his son's signature looks like and that, after looking at Kish's sworn statement given to the officers, he thinks the signature is similar but he "would say no" as to whether he

---

[3]Thus, Plaintiff has already voluntarily dismissed *with prejudice* the claims against Officer Cox that arise out of the events that form the basis of this action.

17

believes it is his son's signature.  (*Id*.).

Plaintiff filed a Motion in Limine, seeking to exclude Kish's statement at trial.  (Docket Entry No. 36).  That motion was referred to Magistrate Judge Mark Randon for hearing and determination.  Judge Randon denied the motion, after full briefing by the parties and a hearing, in an order issued on December 13, 2012.  (Docket Entry No. 49).  Plaintiff did not file objections to that order or seek reconsideration of it and the time for doing so has passed.

**Standard of Decision**

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S at 252.

The court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002).  "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).  "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

18

**ANALYSIS**

**I.**   **The Individual Defendants Are Entitled To Qualified Immunity With Respect To Plaintiff's Section 1983 Claims**

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation.  *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, Defendants have raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

There are three individual Defendants in this case (Officers Cox, Grabowski, and Carroll).  "Each defendant's liability must be assessed individually based on his [or her] own

19

actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Generally, mere presence at the scene, without a showing of direct responsibility for the action, will not subject an officer to liability. *Id.*

Plaintiff's Complaint asserts the following § 1983 claims against the three individual Defendants: 1) "False Arrest And False Imprisonment   Ms. Regets" (Count I); 2) "Violation of the Fourth Amendment: Unreasonable Search and Seizure 42 U.S.C. § 1988 [sic]   Ms. Regets" (Count II); 3) "Civil Conspiracy to Violate Plaintiff's Civil Rights 42 U.S.C. § 1983   Ms. Regets" (Count III); 4) "Deliberate Indifference to a Known Medical Condition 42 U.S.C. § 1983 Fourteenth And/Or Eighth   Estate" (Count VI); and 5) "Unreasonable Search and Seizure, Fatal Force 42 U.S.C. § 1983   Under Fourth Amendment   Estate" (Count VII).

### A. Viewing The Facts In The Light Most Favorable To Plaintiff, Plaintiff Has Not Established A Constitutional Violation As To Any Of The Officers

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with respect to either of the officers.

### 1. Right To Be Free From Unreasonable Searches

In Count II, Plaintiff alleges that the officers searched Plaintiff's house and seized property without probable cause. In Count VII, asserted on behalf of the Estate, Plaintiff alleges that the officers searched Thomas's hotel room and seized his personal property without probable cause.

In their Motion for Summary Judgment, Defendants note that both Plaintiff's house and Thomas's hotel room were searched pursuant to search warrants. As such, they direct the Court

20

to *Messerschmidt v. Millender*, __ U.S. __, 132 S.Ct. 1235, 1245 (2012) and assert that the officers are entitled to qualified immunity because, even construing the facts in the light most favorable to Plaintiff, Plaintiff cannot establish that no reasonably competent officers could have concluded that these warrants should have been issued.  (Defs.' Br. at 10-2).

Defendants further assert that there is an even lesser basis for asserting a claim against Officer Grabowski, who was not involved in interviewing Kish, or preparing the search warrants or affidavits, and simply helped execute them.

In response, Plaintiff assert that the officers were required to independently corroborate Kish's statement to them in order for probable cause to have existed.  (*See* Pl.'s Br. at 11).  In making this argument, Plaintiff cites a case that deals with the situation were officers are confronted with "hearsay information from a confidential informant" that is used to obtain a search warrant.  (*Id.*, citing *United States v. Frazier*, 423 F.3d 536, 532 (6th Cir. 2005)).  But, as Defendants note in their Reply Brief, this is not a situation where a search warrant was obtained based upon hearsay statements from a confidential informant.  Kish was not a confidential informant; he was a known informant identified in the search warrant affidavit who also gave a sworn written statement.  That is, Kish came to the Plymouth Police Department and, under penalty of perjury, signed a sworn statement.  Moreover, the officers then contacted the Wayne County Prosecutor's Office and Stevens examined Kish under oath.  Stevens then advised the officers that he believed probable cause for the warrants existed.  Plaintiff's reliance on *Frazier* is misplaced.[4]

_____

[4]And even though Kish was not a confidential informant, what he was telling the officers did, in fact, correspond with the officers' own pre-existing knowledge.  Kish told the officers that Neileigh planned to help her husband commit suicide at a hotel by bringing him medications to

As explained below, given the applicable standard, Plaintiff cannot establish a constitutional violation as to any of the officers, even when evidence is construed in the light most favorable to Plaintiff.

Like the plaintiff in *Messerschmidt,* Plaintiff alleges that she and Mr. Steiner were subjected to unreasonable searches in violation of the Fourth Amendment because the warrants authorizing the searches were not supported by probable cause.  The officers in this case, like the officers in *Messerschmidt*, assert that they are entitled to qualified immunity as to these claims.

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt, supra*, at 1244 (quoting *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S.C. 2074, 2085 (2011)).

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt, supra*, at 1245.  Nevertheless, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Id*.  The Supreme Court has "recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Messerschmidt, supra*, at 1245 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, (1986)).  "The 'shield of immunity' otherwise conferred by the warrant" "will be lost, for

---

be delivered to her house.  Chief Carroll knew, from the department having responded to a domestic dispute at the house, that Neileigh had married "an elderly gentlemen" and that, for some reason, he was not living at the Arthur Street home with his Neileigh.

22

example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Messerschmidt, supra*, at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). The Supreme has noted that "the threshold for establishing this exception is a high one, and it should be." *Messerschmidt, supra*, at 1245.

The Court concludes that this high standard is not met here. This is simply not one of those rare situations where, despite the issuance of a search warrant by a neutral magistrate, "it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Messerschmidt, supra*, at 1245.

### 2. Right To Be Free From False Arrest / Imprisonment

Plaintiff's Complaint asserts false imprisonment claims on behalf of both Neileigh and the Estate. They are fundamentally different claims and must be analyzed separately.

### a. False Imprisonment Brought On Behalf Of Neileigh

In Count I, Plaintiff asserts, pursuant to § 1983, a claim for "False Arrest And False Imprisonment." Neileigh alleges that she was arrested without probable cause. (Compl. at ¶ 43).

In their Motion for Summary Judgment, Defendants contend that they are entitled to qualified immunity as to this claim. They contend that, even when the facts are construed in the light most favorable to Plaintiff, she cannot establish a Constitutional violation because her arrest was supported by probable cause. The Court agrees.

In order for a plaintiff to prevail on a theory of wrongful arrest under § 1983, she must prove that the police lacked probable cause. *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). As explained in *Fridley*:

23

> A police officer has probable cause if there is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1, (1989)), cert denied, 535 U.S. 955, 122 S.Ct. 1358, 152 L.Ed.2d 354 (2002).  A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

*Fridley*, 291 F.3d at 872.

The parties have directed the Court to two Michigan statutes prohibiting assisting another person to commit suicide, M.C.L. § 752.1027 and M.C.L. § 750.329a.  (*See* Defs.' Br. at 14-15; Pl.'s Br. at 14).   M.C.L. § 752.1027, titled "Criminal assistance to suicide," provides, in pertinent part, that:

(1)     A person who has knowledge that another person intends to commit or attempt to commit suicide and who intentionally does either of the following is guilty of criminal assistance to suicide, a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both:

> (a)     Provides the physical means by which the other person attempts or commits suicide.

> (b)     Participates in a physical act by which the other person attempts or commits suicide.

M.C.L. § 752.1027(1).

M.C.L. § 750.329a, titled "Intent to assist an individual in killing oneself; common law assisted suicide offense," provides, in pertinent part, that:

(1)     A person who knows that an individual intends to kill himself or herself and does any of the following with the intent to assist the individual in killing himself or herself is guilty of criminal assistance to the killing of an individual, a felony punishable by imprisonment for not more than 5 years or a fine of not more than $10,000.00, or both:

24

      (a)      Provides the means by which the individual attempts to kill himself or herself or kills himself or herself;

      (b)      Participates in an act by which the individual attempts to kill himself or herself or kills himself or herself;

      (c)      Helps the individual plan to attempt to kill himself or herself or to kill himself or herself.

M.C.L. § 750.329a.

The existence of probable cause in a § 1983 action presents a jury question, "unless there is only one reasonable determination possible." *Plyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). The Court finds that is the situation here. Even when viewing the facts in the light most favorable to Plaintiff, there was probable cause to arrest Plaintiff on June 19, 2009.

In order for Chief Carroll to have probable cause to arrest Neileigh on June 19, 2009, he needed only a "fair probability" that Neileigh intended to commit a crime by violating one of the statutes above.

At the time that Chief Carroll arrested Neileigh, he and Officer Cox were aware that Kish had given a detailed account of the alleged plan to assist Thomas Steiner in committing suicide, in violation of the above statutes. Kish gave an oral statement, followed by a sworn written statement, on June 18, 2009. He also included a handwritten diagram indicating where he had personally observed the medications that Neileigh stated she was going to give to Thomas to enable him to commit suicide. Out of an abundance of caution, the officers then contacted the Wayne County Prosecutor's Office for assistance in evaluating the information provided to them. On June 19, 2009, Officer Cox took Kish to the Wayne County Prosecutor's Office. After Stevens spent "several minutes of reading him the pains of perjury," Stevens put Kish under oath and examined him. Kish's description of the events he had heard and witnessed remained

consistent.  In addition, according to the information Kish provided to them, time was of the essence because the plan was for Thomas to commit suicide within the week, before his life insurance policy expired.

Based on the facts and circumstances within his knowledge, there was a "fair probability" that Neileigh intended to commit a crime by violating one of the statutes above.

Plaintiff's brief argues that probable cause was lacking here because Kish had tried to strangle her in 2004, and because Kish had recently become angry when Neileigh denied his request for money, which gave him a motive to lie.

But the "probable cause determination turns on what the officers knew at the time of the arrest." *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002).  At the time of the arrest, the officers did not know of the alleged incident with Kish in 2004.  Nor did the officers have any knowledge of Kish's recent request for money from Neileigh's, or Kish's alleged statement to Neileigh that she "would be screwed."  Neileigh testified that, while she understood that to mean that her life was in danger, she did not report the incident to any authorities   let alone the Plymouth Police Department.  (Pl.'s Dep. at 58-59).  Indeed, prior to June 19, 2009, Neileigh had never reported any problems with Kish to the Plymouth Police Department.  (Pl.'s Dep. at 61).

### b.    False Imprisonment Claim Brought On Behalf Of Estate

In Count X, Plaintiff asserts a false imprisonment claim on behalf of the Estate.  That count alleges that Defendants "knew or should have known that by seizing Mr. Steiner's life-sustaining medication and access to Ms. Regets without probable cause, he would become unable to care for himself, communicate his needs and leave his hotel room to receive assistance." (Compl. at ¶ 100).  That is, Plaintiff alleges that "Defendants knew or should have known that

26

their actions would directly or indirectly result in Mr. Steiner being confined within his hotel room." (Compl. at ¶ 101).

In seeking summary judgment as to this Count, Defendants assert that the allegations as to this claim have no support in the record. First, Defendants note that the officers did not seize all the medications from Thomas's hotel room and that Officer Cox specifically asked Thomas if the seizure of the two unopened packages would cause him any problems and he responded in the negative. Second, Defendants note that there is no evidence in the record to support the allegation that Thomas was somehow confined to his hotel room by virtue of not having his medication or by virtue of Neileigh being in jail. The Court agrees.

There is no evidence in the record before this Court to establish that the officers knew or should have known that Thomas would be unable to care for himself without the medications in the seized packages or that he would be unable to leave his room if he did not have those packages or access to Neileigh.

The evidence reflects that Thomas told Officer Cox that he would be ok and that he did not need the medications in the seized packages at that time. Thomas stated that he had the medications that he needed and that he would be fine over the weekend and into the week *when he could go to the pharmacy* and get another prescription for those medications. (Cox Dep. at 101-102) (emphasis added). Based on Thomas's statements    including that Thomas could go to the pharmacy    Officer Cox would have no reason to believe that Thomas would somehow be confined to his hotel room by virtue of not having the seized packages.

And Plaintiff's allegation that Defendants knew or should have known that Thomas would be unable to leave his hotel room if he "lacked access to Neileigh" fares no better.

27

On the date in question, Neileigh was arrested *before* any of the officers went to the Extended Stay hotel to execute the search warrant there. Although Neileigh had already been arrested by the time the officers went to Thomas's hotel room, Thomas was not in the hotel room when they arrived. Thus, the record does not support Plaintiff's allegation that the officer's should have known that Thomas was unable to leave the hotel room without Neileigh.

The Court concludes that the officers are entitled to qualified immunity as to this claim. Even construing the facts in the light most favorable to Plaintiff, there was no Constitutional violation.

## II.   Defendants Are Entitled To Summary Judgment As To Plaintiff's Conspiracy Claims

Although Count III of Plaintiff's Complaint is titled "Civil Conspiracy to Violate Plaintiff's Civil Rights 42 U.S.C. § 1983   Ms. Regets", the body of that count indicates that Plaintiff alleges a civil conspiracy under both § 1983 and § 1985. (*See* Compl. at ¶ 58).

### A.   Conspiracy Claim Under § 1983

Defendants contend that Plaintiff cannot establish a civil conspiracy claim. They contend that Plaintiff has failed to plead any facts or proffer any evidence suggesting the existence of an agreement to engage in any unlawful action. They contend that Plaintiff's conspiracy claim under § 1983 is based on mere speculation and conjecture and it should therefore be dismissed. The Court agrees.

As set stated in *Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012), the "standard for proving a civil conspiracy claim in the Sixth Circuit" is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not

28

> have known all of the details of the illegal plan or all of the participants involved.
> All that must be shown is that there was a single plan, that the alleged
> coconspirator shared in the general conspiratorial objective, and that an overt act
> was committed in furtherance of the conspiracy that caused injury to the
> complainant.

*Id*. at 695 (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).

Here, Plaintiff offers no evidence of an agreement among the alleged conspirators.

Rather, Plaintiff bases the conspiracy claims on the fact that the officers obtained search warrants

and arrested Plaintiff.  As set forth above, however, the officers had probable cause to do so.

And while a conspiracy may be demonstrated by circumstantial evidence, "circumstantial

evidence alone cannot support a finding of conspiracy when the evidence is equally consistent

with independent conduct."  *Re/Max Intern., Inc. v. Realty One, Inc*., 173 F.3d 995, 1009 (6th

Cir. 1999); *see also Hensley, supra*.  As was the situation in *Hensley,* the officers' actions in this

case were as consistent with independent conduct as with a conspiracy.  *Hensley*, 693 F.3d at

695.

Plaintiff offers nothing beyond mere conjecture and speculation that an agreement existed

in this case.  Defendants are therefore entitled to summary judgment as to this claim.  *Moore v.

City of Paducah*, 890 F.2d 831, 834-35 (6th Cir. 1990).

### B.     Conspiracy Claim Under § 1985

In response to Defendants' Motion for Summary Judgment, Plaintiff agrees that her

conspiracy claims under § 1985 should be dismissed.  (Pl.'s Br. at 20 & 26).

### III.    Defendants Are Entitled To Qualified Immunity As To Count VI Because Plaintiff Cannot Establish That Defendants Acted With Deliberate Indifference To The Decedent's Health Or Safety

Count VI of Plaintiff's Complaint is titled "Deliberate Indifference To A Known Medical

Condition 42 U.S.C. § 1983 Fourteenth And/Or Eighth   Estate."  This Count alleges that "[o]n June 19, 2009, Defendants knew or should have known that Mr. Steiner was a person who required certain medical prescriptions and certain medical and/or psychiatric care."  (Compl. at ¶ 76).  The Complaint alleges that "Defendants were deliberately indifferent to Mr. Steiner's Fourteenth and Eighth Amendment right to medical and psychiatric care.  By removing Mr. Steiner's prescription medication in his then-unstable mental and physical state, Defendants caused unreasonable and unnecessary conditions and stresses that caused and/or contributed to his death on June 22, 2009."  (Compl. at ¶ 77).  It alleges that the "actions of the Defendants were so severe, so wanton and reflect such quantum disregard for the constitutionally protected rights under the substantive due process clause of the Fourteenth Amendment and Eighth Amendments, Ms. Regets, as Personal Representative of the Estate of Thomas J. Steiner, requests punitive damages for the constitutional violations."  (*Id*. at ¶ 78).

### A.    No Eighth Amendment Claim Exists Because Steiner Was Not A Prisoner.

"The Eighth Amendment prohibition on cruel and unusual punishment protects *prisoners* from the 'unnecessary and wanton infliction of pain.'" *Villegas v. Metropolitan Govt. of Nashville*, __ F.3d __ (6th Cir. 2013) (citations omitted) (emphasis added).  "Proving an Eighth Amendment claim requires that the plaintiff make a showing of deliberate indifference." *Id*. Claims that a state actor has acted with deliberate indifference to a prisoner's health or medical needs are not uncommon.

Such claims of deliberate indifference to health can also be brought by a pre-trial detainee, "though they sound in the Due Process Clause of the Fourteenth Amendment *rather than the Eighth Amendment*." *Id. (emphasis added).*

30

Here, Thomas Steiner was not a prisoner at any time.  Indeed, he was not even a pre-trial detainee at any point.  Thus, there can be no Eighth Amendment claim asserted on his behalf.

### B.   The Deliberate Indifference Standard Applies To The Estate's Substantive Due Process Claim Under The Fourteenth Amendment.

"The Due Process Clause Of the Fourteenth Amendment is 'phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.'" *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (citing *DeShaney v. Winnebago County Dep't of Social Servs*., 489 U.S. 189, 195 (1987)).  State officials may therefore be subject to constitutional liability if they fail to provide protection for individuals in state custody." *Ewolski,* 287 F.3d at 509.

"Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to dangers or otherwise place citizens in harm's way." *Id*.  Such claims are based upon a "state-created danger" theory. *Id.*

Given that Thomas was never in custody, the Estate's only viable theory is that the officers violated Thomas Steiner's substantive due process rights by removing the packages of medications from his room and thereby leaving him vulnerable and/or increasing the risk that he would die.

But the "due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  A plaintiff "must demonstrate the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski*, 287 F.3d at 510.  As stated in *Ewolski*:

31

> The Supreme Court has explained, this requires that the § 1983 plaintiff show that
> the challenged action was so "egregious" that it can be said to be "arbitrary in the
> constitutional sense." *Id.* at 846, 118 S.Ct. 1708 (quotation omitted). The
> Supreme Court, in elaborating upon this standard, has repeatedly instructed that
> the Fourteenth Amendment protects only against abuse of executive power which
> "shocks the conscience." *Id.*

*Ewolski*, 287 F.3d at 510.

Whether conduct reaches the level of conscience shocking "depends upon the facts and circumstances of the individual case." *Ewolski*, 287 F.3d at 510. The "critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Id.* Thus, in situations where actual deliberation is practical, the deliberate indifference standard is applied. *Id.* at 510-511. On the other hand, where circumstances require an instant judgment, as the situation seen with high speed vehicle chases, deliberation is not practical and a violation occurs only when the police act with malice and intent to harm. *Id.* at 511.

Applying this framework, the Court concludes that this particular case falls within the "'middle-range' between custodial settings and high-speed chases,'" and the appropriate standard to be applied is deliberate indifference. *Ewolski,* 287 F.3d 492 at 511. This is because the officers had time to deliberate their decision as to whether to confiscate the two unopened packages.

As explained by the Sixth Circuit in *Ewolski,* "[d]eliberate indifference has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the state official knows of and disregards an excessive risk to [the victim's] health or safety." *Ewolski*, 287 F.3d at 513 (citations omitted). "Thus, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference.'" *Id.*  And, having drawn the inference, the official must act or fail to act in a manner

demonstrating "reckless or callous indifference" toward the individual's rights.  *Id.*

Here, upon entering the hotel room to execute the search warrant, Officer Grabowski

found what appeared to him as the medications that Thomas was taking on a daily basis.  He

decided not to confiscate those and left them in the room.  Officer Grabowski did decide to

confiscate two sealed grayish-white mailing packages from the hotel room, which sounded like

they contained pills.  (Grabowski Dep. at 34; Cox Dep. at 63-65).  Those sealed packages were

not opened by the officers.  (*Id.*).  Officer Grabowski then gave Officer Cox Thomas's telephone

number so that he could be contacted.

Officer Cox then contacted Thomas via telephone.  Officer Cox asked Thomas how he

was feeling at that time and if he had any intention of harming himself at that time.  Thomas

replied that he was feeling good and was not going to attempt suicide.  (Cox Dep. at 95).

Officer Cox and Thomas then discussed the packages that the officers had confiscated

from his hotel room.  (Cox Dep. at 97).  Thomas advised that Neileigh had delivered those

packages to him a day or two before the search and that he had not yet opened those packages.

(Cox Dep. at 97-98).  Officer Cox told Thomas that the officers had advised that they believed

they left the medications that Thomas uses on a daily basis in the room.  Officer Cox asked

Thomas if he would be all right without the two packages of medications that had been

confiscated by the officers that day.  Thomas told Officer Cox that he would be ok and that he

did not need the medications in the packages at that time. He stated that he had the medications

that he needed and that he would be fine over the weekend and into the week when he could go

to the pharmacy and get another prescription for those medications.  (Cox Dep. at 101-102).

Officer Cox testified that he pressed Thomas on this issue and that Thomas responded again that he would be fine without the medications that had been confiscated by the officers. (*Id*.).

Applying this deliberate indifference standard, the Court concludes that Plaintiff has not shown a genuine issue of material fact as to whether the conduct of the officers rose to the level of conscience shocking under the particular circumstances presented. The Court concludes that the Defendant Officers are entitled to qualified immunity with respect to this claim.

**IV.    Counts IV And VIII Shall Be Dismissed Because Plaintiff Cannot Establish Municipal Liability**

Counts IV and VIII of Plaintiff's Complaint assert municipal liability claims against the City, on behalf of Plaintiff and the Estate.

Defendants' motion contends that all claims against the City must be dismissed because Plaintiff cannot establish municipal liability. Defendants contend that Plaintiff's claims against the City must be dismissed because Plaintiff cannot establish municipal liability here based on a failure-to-train theory.

**A.    Given That The Court Finds That Plaintiff Cannot Establish That The Officers Violated Her (Or Decedent's) Constitutional Rights, Plaintiff's Municipal Liability Claims Must Also Be Dismissed**

Counts IV and VIII of Plaintiff's Complaint seeks to hold the City liable for the alleged Constitutional violations by the officers.

Given that this Court finds that the individuals officers did not violate Plaintiff's (or the decedent's) Constitutional rights, however, Plaintiff cannot rely on their conduct to establish a claim of municipal liability against the City and Counts IV and VIII must be dismissed. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010); *see also Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the

34

individual defendant is established, the municipal defendants cannot be held liable under §
1983.").

Accordingly, Counts IV and VIII must be dismissed and no further analysis as to
municipal liability is necessary.

> **B.    In Addition, Even If Plaintiff Could Establish A Constitutional Violation By
> An Officer, Plaintiff Could Not Establish Municipal Liability Here.**

A local government is only liable under § 1983 for its own wrongdoing and not under any
theory of respondeat superior.  A municipality may, however, "be held liable under § 1983 if it
maintained a policy or custom that caused the violation" of the plaintiff's rights.  *Harvey v.
Campbell County*, 453 Fed.App'x 557, 562 (6th Cir. 2011).

"A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy
must identify the policy, connect the policy to the County itself and show that the particular
injury was incurred because of the execution of that policy."  *Graham ex rel. Estate of Graham v.
County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).

Here, however, Plaintiff does not base the claims against the City on any actual custom or
policy.  Rather, Plaintiff's § 1983 claim against the City is a claim predicated upon a "failure to
train" theory of municipal liability.

In limited circumstances, a local government's failure to train police officers may be
deemed a "policy or custom" for purposes of municipal liability.  *City of Canton v. Harris*, 489
U.S. 378, 389 (1989).  "[I]nadequacy of police training may serve as the basis for § 1983 liability
only where the failure to train amounts to deliberate indifference to the rights of persons with
whom the police come into contact.*"  City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  "Only
where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate

indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*

"To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller*, 606 F.3d at 255 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, Plaintiff has not shown that the City knew of prior unconstitutional actions by its officers and failed to respond. *Fisher,* 398 F.3d at 849. Accordingly, the City would be entitled to summary judgment as to Counts IV and VIII even if Plaintiff could establish a constitutional violation by one of the three individual Defendants.

**V.      It Is Now Undisputed That The Court Should Dismiss The ADA Claims Asserted In Count IX Of Plaintiff's Complaint.**

Count IX of Plaintiff's Complaint asserts claims under the Americans with Disabilities Act. Defendants' Motion for Summary Judgment seeks dismissal of that count.

In response to Defendants' Motion for Summary Judgment, Plaintiff states that she does "not contest summary judgment in regard to that count." (Pl.'s Br. at 26.).

Accordingly, the Court shall dismiss Count IX.

**VI.      Defendants Are Entitled To Summary Judgment As To Counts V And XI Because Plaintiff Cannot Establish Intentional Infliction Of Emotional Distress Claims Under Michigan Law**

Counts VI and XI of Plaintiff's Complaint assert claims for intentional infliction of emotional distress on behalf of Plaintiff and the Estate.

Under Michigan law, the essential elements of a claim of intentional infliction of emotional distress are: 1) extreme and outrageous conduct, 2) intent or recklessness, 3) causation,

36

and 4) severe emotional distress.  *Graham v. Ford*, 237 Mich.App. 670, 674 (2000); *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir. 2005).  In ruling on such a claim, it is initially for the trial court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous to permit recovery.  *Webster*, 394 F.3d at 442.  If reasonable minds may differ, however, "it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct is sufficiently extreme and outrageous to result in liability.  *Id.*

"Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Graham,* 237 Mich. App. at 674.

Defendants asserts that they are entitled to summary judgment with respect to these claims because Plaintiff cannot establish the essential elements of the claim.  Defendants assert that Plaintiff cannot identify any conduct on the part of the officers that could be considered extreme or outrageous such as to support a claim for intentional infliction of emotional distress. The Court agrees.

The officers had probable cause to obtain the search warrants at issue in this case, and probable cause to arrest Neileigh.  And as explained above, Officer Cox made a reasonable judgment call, based upon Thomas Steiner's statements to him, that he would be fine without the medications that were confiscated.  There was no extreme or outrageous conduct by any of the officers that could support a claim for intentional infliction of emotional distress.

37

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary

Judgment is GRANTED and this action shall be DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 8, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on
April 8, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager
